**22–CV–03821 (JMA)**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

MARSHALL HUBSHER,

*Petitioner,*

*- against -*

DEPARTMENT OF CORRECTIONS COMMUNITY
SUPERVISION PROBATION OFFICER
DWAYNE SHAW,

*Respondent.*

RESPONDENT'S AFFIDAVIT AND MEMORANDUM OF LAW
IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

ANNE T. DONNELLY
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3660
Jason.Richards@nassauda.org

Tammy J. Smiley
Jason R. Richards
  Assistant District Attorneys
    *of Counsel*

## TABLE OF CONTENTS

Page

Respondent's Affidavit In Opposition ...................................................................i-xviii

Respondent's Memorandum Of Law

    Table of Authorities .......................................................................................... i
    Introduction ...................................................................................................... 1

    Argument

        Point I
        The Petitioner's *Brady* Claim Entitles Him To No Relief Because
        He Has Failed To Demonstrate That The State Courts' Adjudication
        Of The Claim Was Objectively Unreasonable ......................................... 3

        Point II
        The Petitioner Has Failed To Demonstrate That The State Courts
        Applied *Strickland* Unreasonably In This Case, Where The Record
        Establishes That Trial Counsel Was A Competent Professional Who
        Had A Viable Defense Strategy ............................................................... 12

        Point III
        The Petitioner's Challenge To The Constitutionality Of Section
        130.05(3)(h) Of The New York Penal Law Is Barred From This
        Court's Review And, In Any Event, Entirely Without Merit ..................... 16

           A. The Petitioner Has Failed To Make The Exceptional
              Showing Of Cause And Prejudice That Would Allow Habeas
              Review Of His Procedurally Defaulted Claim ................................. 17

           B. It Was Not Objectively Unreasonable For The Appellate
              Division To Conclude That Penal Law § 130.05(3)(h)
              Provided Adequate Notice To The Petitioner And Clear
              Criteria For Enforcement To The Police. ........................................ 19

        Conclusion ....................................................................................................... 22

Certificate of Service

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| MARSHALL HUBSHER, | AFFIDAVIT IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS |
| *Petitioner,* | |
| - *against* - | 22-CV-03821 (JMA) |
| DEPARTMENT OF CORRECTIONS COMMUNITY SUPERVISION PROBATION OFFICER DWAYNE SHAW, | |
| *Respondent.* | |

---

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NASSAU    )

JASON R. RICHARDS, being sworn, deposes and states as follows:

1.      I am an assistant district attorney, of counsel to the Honorable Anne T. Donnelly, District Attorney of the County of Nassau, and am admitted to practice before this Court.

2.      This affidavit is submitted pursuant to the order of this Court, dated December 14, 2022, directing the respondent to show cause why a writ of habeas corpus should not be issued.

3.      By agreement with the Office of the New York State Attorney General, the Nassau County District Attorney's Office ("District Attorney") is representing the respondent in this matter.

4.      Unless otherwise indicated, this affidavit is made upon information and belief, based upon the records and files of the District Attorney.

5.      The petitioner was Kerry K.'s psychiatrist. At her first appointment with the doctor in March 2012, Kerry disclosed her most sensitive personal issues, including her long-term

i

struggles with depression and anxiety. The petitioner discussed a treatment plan with Kerry and wrote her a prescription for a new antidepressant.

6.    Kerry went to the petitioner's office for a second appointment on April 3, 2012. Near the end of that treatment session, the petitioner sat next to her on the patient's couch, told her that having an orgasm would be therapeutic for her, and, unsolicited, kissed her while pushing her down on the couch. Kerry was shocked and did not know how to respond. The petitioner pulled down her pants and underwear, licked her vagina, and penetrated her with his fingers and penis.

7.    Kerry reported the rape to the police a few days later. At their request, she participated in recorded telephone calls with the petitioner and turned over voicemails that he had left for her since the rape. In the voicemails and recorded calls, the petitioner referred to himself as "Dr. Hubsher" and to Kerry as his patient, and they discussed her treatment, medication, and insurance coverage. In the recordings, the petitioner admitted also that he had had sex with her during their last treatment session.

8.    Under Nassau County Indictment 2049N-2012, the petitioner was charged with rape in the third degree (N.Y. Penal Law § 130.25[1]) and criminal sexual act in the third degree (N.Y. Penal Law § 130.40[1]). The People prosecuted the petitioner under the theory that Kerry could not consent to the petitioner's conduct because she was his patient, he was a psychiatrist, and the sex occurred during a treatment session. *See* N.Y. Penal Law § 130.05(3)(h).

9.    In March of 2016, the petitioner stood trial in the Supreme Court of the State of New York, Nassau County ("Supreme Court") (Delligatti, J.). The victim testified that in 2012 she was thirty-two years old and worked as a bookkeeper in Brooklyn. She was also a musician and played with a band at the time. Kerry suffered from depression, anxiety, and attention deficit disorder. Without proper medication, she found it difficult, or felt no urge, to leave her apartment,

work, eat, and stay organized. Kerry had taken medication and received treatment for her conditions for the past eleven years (Kerry: T589-93).[1]

10.    The victim further testified that on March 29, 2012, at about 8:00 p.m., she drove to the petitioner's office in Roslyn for her scheduled appointment. The petitioner greeted Kerry at the door to the office building, then led her to his office. His office space had "a small waiting room, no reception area or anything, just a couple of chairs, and then his office in the back." The office itself had the petitioner's diplomas framed on the walls, a desk, an armchair for the petitioner, and a couch for patients (Kerry: T600-01).

11.    That first treatment session went well, the victim testified. The petitioner was "very friendly." He told Kerry that he had musicians as patients before and that "he would help [her] get out of this dark cloud" of depression. The petitioner asked her about her medical history, and she described it for him. She told him about her current course of medication and that she had been hospitalized due to her depression three or four times in her life. The petitioner asked why she had been "feeling so down" recently, and she "told him about the car accident and [her] financial troubles." The petitioner also asked whether Kerry had experienced any "traumatic events" in the past, and she told him that she had been date-raped when she was sixteen years old—an event she had only ever discussed with her psychiatrists (Kerry: T601-05).

12.    Kerry testified that when she told the petitioner that she was behind on her rent, he offered to pay it. Kerry "thought it was very nice of him, but [she] refused. [She] said, 'No thanks, I'll figure it out. I always do'" (Kerry: T605 [edited for clarity]).

13.    The petitioner gave Kerry free samples of Viibryd, she testified, and he wrote her a prescription for a new medication, Paxil. He "asked [her] to come back the following week . . .

---

[1] Numbers in parentheses preceded by "T" and "S" refer, respectively, to pages of the trial and sentencing transcripts.

to follow up with the [new] medication." They scheduled a second appointment for April 3, 2012. Overall, Kerry was "very happy" with her first treatment session with the petitioner. "He seemed like a really great doctor, very compassionate," and he "promised [her] he was going to help [her] get better" (Kerry: T609-10).

14.     On April 1, 2012, in between Kerry's first and second appointments with the petitioner, he called to "check on [her]," she testified. The petitioner asked how Kerry was feeling and about her medications. Kerry mentioned that she had just argued with her mother, MARY K., about whether Kerry would help prepare for the upcoming Easter holiday. The petitioner asked for Mary's number, and Kerry gave it to him. After speaking with Kerry, the petitioner called Mary, identified himself as Kerry's psychiatrist, and told her that Kerry was in a "very fragile" state, so Mary should avoid pressuring her (Kerry: T614-17, 728; Mary: T851-54).

15.     Kerry testified that she arrived at the petitioner's office for her second appointment at about 8:00 p.m. on April 3, 2012. She did not see anyone else in the building, and other than the petitioner, no one else was in his office. The petitioner hugged Kerry when she arrived. She sat on the patient couch, and the petitioner sat in his armchair (Kerry: T618-19). The treatment session progressed routinely. The petitioner and Kerry "were just talking about things going on in [her] life." She told him that she had previously experienced a reduced sex drive, among other side effects, from her medications. The petitioner also asked about her financial difficulties and whether her parents could help her. Kerry said she would not ask them for help because "[she was] an adult and . . . didn't want them to know she was in such bad shape" (Kerry: T619-20).

16.     According to the victim, the petitioner again offered to pay her rent. He said, "This is something that's affecting your life right now. Let's just get rid of that obstacle, and once you start feeling better, you will be working more and you will get better." Kerry did not feel

comfortable owing her doctor money, but after he insisted three times, she agreed to accept a check

from the petitioner for two months' rent, $2,600, on the condition that he write a note for her to

sign promising that she would pay him back (Kerry: T621, 770).

17.    Kerry testified that the petitioner handwrote the following note on his professional

letterhead:

MARSHALL J. HUBSHER, M.D., P.C.
1025 NORTHERN BLVD., SUITE 95
ROSLYN, NEW YORK 11576
——
TELEPHONE (516) 627-6648

4/3/12

I am not now, nor will I be in the future, a patient of Dr. Hubsher.
I owe Marshall Hubsher $2,600 and will
pay this debt by Dec 1, 2012. I received this check
today 4/3/12.

Kerry Kennedy

Kerry signed the note, but the petitioner kept it without making a copy for her. When Kerry signed

the note, it did not include the line, "I am not now, nor will I be in the future, a patient of Dr.

Hubsher." She only saw that line on the copy of the note that the petitioner produced at trial, not

in the original (Kerry: T621-22, 759-63; Petitioner's Exhibit E [copy of note]).[2]

---

[2] Although he presented a copy of the note, defendant never produced the original for the court, the People, or witnesses to inspect. The People, therefore, never had an opportunity to submit the note to an expert to determine whether the disputed line and the rest of the note were written simultaneously. The court, nonetheless, admitted a copy of the note into evidence over the People's best-evidence-rule objection (Kerry: T759-63).

18.    Kerry stated that the petitioner gave Kerry the check near the end of the treatment session, when they scheduled her next appointment. As Kerry started to get up to leave, the petitioner sat next to her on the patient couch and asked if he could kiss her. Kerry said, "No, that's not a good idea," but the petitioner kissed her anyway. "He put his tongue down [her] throat and pushed [her] down on the couch and got on top of [her]." The petitioner "grind[ed]" his body against Kerry's over their clothes. He told her that "[she] should be having orgasms because they are good for depression, and that he was recommending giving [her] one as part of [her] treatment" (Kerry: T622-25, 755-56).

19.    As Kerry lay on the couch, the petitioner pulled off her pants, she testified. He licked her vagina and penetrated it with his fingers. The petitioner asked if Kerry was on birth control. She said, "No." The petitioner retrieved a condom from his desk, took off his clothes, and put on the condom. He then penetrated her vagina with his penis. After he finished, the petitioner told Kerry that "he couldn't help himself and that [she] shouldn't tell anybody this happened" (Kerry: T629-30).

20.    The petitioner called and left a voicemail for Kerry, she testified, while she was at her parents' house in Connecticut on Easter Sunday, April 8, 2012. In the message, he referred to himself as "Dr. Hubsher," and suggested that she come to his office that night, instead of waiting until her scheduled appointment on the upcoming Tuesday. The petitioner called her again as she tried to leave a message for him cancelling her appointment. Kerry answered and told him that she was in Connecticut so that she could "get off the phone" with him (Kerry: T633-34; People's Exhibit 5 [voicemails]).

21.    Kerry testified that when she returned that night to her apartment in Brooklyn, she resolved to tell someone that the petitioner had had sex with her. She called a girlfriend and told

her what the petitioner had done. After speaking with her friend, she went to her local precinct to report the rape, and the NYPD put her in contact with the Nassau County Special Victims Squad (Kerry: T635-36). The next day, April 9, 2012, Kerry went to the Special Victims Squad, and Detective REINALDO PACHECO interviewed her. He instructed her to participate in a controlled, recorded phone call with the petitioner to obtain an admission from him, but the petitioner did not answer while she was with the police (Kerry: T636-37; Pacheco: T980-81).

22.    Kerry explained that when she got home later that day, she set up a computer program that she used for her music to record her phone calls. She was able to reach the petitioner, and in their conversation: (1) the petitioner assured Kerry that she was the only patient he had ever "slept with"; (2) the petitioner discussed the "intercourse" that they had on "Tuesday";[3] (3) Kerry told the petitioner that he hurt her when "going down on [her]," and the petitioner said, "You didn't say anything. You mean, when I was sucking you it hurt?"; and (4) the petitioner asked whether he was too rough when "using [his] finger too." The petitioner also asked Kerry whether she had gotten her period and told her that Viibryd and Paxil might cause vaginal bleeding. Kerry emailed the recording of the call to Detective Pacheco (Kerry: T638-42; People's Exhibit 3 [April 9th call]; Pacheco: T982).

23.    The victim testified that she cancelled her appointment with the petitioner on April 10, 2012, and met with Detective Pacheco again on April 11. Pacheco instructed Kerry to attempt another controlled phone call to establish the date and time of the rape with greater specificity. This time, the petitioner answered his phone and the police recorded the conversation. Kerry said that she needed to confirm the dates of her two treatment sessions for her health insurance company, and the petitioner confirmed that the previous appointment occurred on

_____

[3] April 3, 2012, the date of incident, was a Tuesday.

April 3, 2012. The petitioner said that he would submit claims for biweekly sessions to Kerry's insurance company. When Kerry asked whether she should plan on the "same kinda thing happening . . . like what happened in [the petitioner's] office on Tuesday," the petitioner told her, "If you want." He also discussed her depression and its symptoms, and the stressors in her life. He told her he could give her more Viibryd samples later that week at their next scheduled session (Kerry: T651; People's Exhibit 4 [April 11th call]; Pacheco: T986).

24.    Detective Pacheco testified that on April 11, with Kerry's consent, the police "dumped" her phone, meaning they extracted the contents of the phone, including voicemails and text messages, so that the police could retain, access, and search that content (Pacheco: T987; JOSEPH NUZZO [Electronics Squad detective]: T942-75). The download contained eleven voicemails that the petitioner left for Kerry between March 29 and April 11, 2012. In the messages, the petitioner identified himself exclusively as "Dr. Hubsher." On April 10, after Kerry had cancelled an appointment, the petitioner left a voicemail in which he said, "Too bad you can't make it in tonight. But we could have a session on the phone too." The next day, in another message, the petitioner said, "And you know, I never lent money to any patient ever. You're the only one I ever lent money to" (People's Exhibit 5 [voicemails]).

25.    Detective Pacheco testified that he arrested the petitioner on April 18, 2012 (Pacheco: T988).

26.    On behalf of the petitioner, Dr. ALEXANDER BARDEY, an expert psychiatrist, testified that a treatment session lasts only for as long as it is scheduled, and "[w]hat goes on after that session is no longer part of the therapy [or session]," but a "sexual encounter" within the timeframe of a session occurs during the session. He also testified that a doctor's ethical violations

viii

during a treatment session, such as subjecting a patient to sexual contact, could terminate the session (Bardey: T1202-75).

27. During jury deliberations, juror Susan Stalzer wrote a note to the court: "I need to be excused from the jury because I'm getting too angry and emotionally involved and it is affecting my health." Upon receipt of the note, the court read it to the prosecutor, defense counsel, and the petitioner (T1501).

28. After a lunch break, the court called Stalzer, the prosecutor, and defense counsel into chambers. The court expressed to Stalzer that she had been an "attentive juror," but the jury had "not been deliberating very long." It asked whether she could continue to deliberate with and listen to her fellow jurors. The following colloquy ensued:

> Stalzer:    Okay, here is my answer:
> When we took this oath -- when I took the oath, I was told to take the oath and base the case on facts, on evidence. Am I correct, facts and evidence?
> The Court:    Correct so far, yes.
> Stalzer:    According to the law that you read us.
> The Court:    Correct.
> Stalzer:    That's not being done. However people determine it, that's their opinion, but it's not --
> The Court:    And that may be your opinion as well.
> Stalzer:    Fair enough. And we are in a deadlock.

The court stated that it had not received a note that the jury was deadlocked. Stalzer reiterated her request to be excused (T1503-05).

29. The court then gave the prosecutor and defense counsel an opportunity to question Stalzer. The prosecutor asked, "When you say it affects your health, is it just the anxiety and that kind of stress?" Stalzer responded:

> No. It's just simply that I get very emotional and very passionate about what I believe, and when presented with a different opinion, I can respect that. But I think that when the different opinion is not backed up by anything, just a feeling or preconceived

ix

> notion or prejudice, I can't deal with that and I get very angry and
> upset, because it's not being fair.

Defense counsel declined to ask any questions. The court asked an officer to bring Stalzer back to the jury room and instructed her that she should not discuss her note or their conversation with the other jurors (T1505-06).

30.     In Stalzer's absence, the court told the prosecutor and defense counsel, "We have three choices, to excuse her and declare a mistrial, direct her to continue, or replace her with an alternate juror." Defense counsel said, "My opinion is to replace her," and asked to step out of chambers to speak to the petitioner about that decision. The court gave counsel time to talk with the petitioner, and when counsel returned, he said, "We believe that, based on the health reasons, [Stalzer] should be excused . . . and that she should be replaced with [an alternate juror]." The prosecutor expressed concern that Stalzer had not described an "illness" within the meaning of N.Y. Crim. Proc. Law § 270.35, but the court determined, with the petitioner's consent, to proceed with the substitution (T1506-09).

31.     Back in open court, with the petitioner present, the court reread Stalzer's note. It then summarized the conversation that the court and attorneys had with Stalzer in chambers. The court told the petitioner that he had "an absolute right under the constitution to refuse to consent to replacing that juror," in which case, the court would declare a mistrial and defendant "would be entitled to a new trial" (T1510-11).

32.     The petitioner confirmed his desire to replace Stalzer with an alternate juror, and signed a form entitled, "Consent To Substitute A Deliberating Juror." Defense counsel signed the consent form as well. The form stated that the petitioner agreed to replace Stalzer with the first alternate juror, and that he was signing the form "in open court, and in the presence of the Court" (Court Exhibit XV).

x

33.    The court excused Stalzer from the jury and substituted an alternate juror. It instructed the alternate juror that she would "participate in the deliberations going forward." The court also instructed the remaining jurors to "bring [the alternate] up to date as to what your deliberations have been up to this point, so that she can be up to speed as to where the rest of you are at this point" (T1513-14).

34.    The date on which the court excused Stalzer, March 18, 2016, was a Friday. Approximately two hours after the juror substitution, at about 4:37 p.m., the jury sent a note: "After considering the evidence, with much discussion and deliberation, we have come to a final vote, which unfortunately did not reach a unanimous decision." The court told the prosecutor and the petitioner that due to the late hour, it would adjourn proceedings for the weekend and deliver an *Allen* charge on the following Monday when the trial was set to resume. Neither party objected (T1515-16).

35.    The court then told the jurors, "I'm going to bring you back on Monday, and I will give you substantially [sic] additional instructions that I am required to do when I have a jury that feels deadlocked." Before dismissing the jury for the weekend, however, the court nonetheless stated that: (1) "after further deliberations, most juries [that feel deadlocked] are in fact able to reach a unanimous verdict"; (2) the court and the lawyers "continued to have confidence" that the jurors could perform their duty; and (3) "there was no reason to believe" that "another jury would be any more intelligent, reasonable, or hardworking and fair as you have been." The court instructed the jurors to continue their deliberations when they returned on Monday morning until the court recalled them for "further instructions" (T1516-18). On the following Monday, March 21, 2016, before the court had recalled the jury to deliver additional deadlock instructions, the jury sent a note stating that it had reached a verdict.

xi

36.    During the trial, the petitioner disguised himself, entered the courthouse, and left notes for the jury in the room where it deliberated. Despite his efforts to interfere with the jury's deliberations, on March 21, 2016, the petitioner was convicted of both charges against him: rape in the third degree (Penal Law § 130.25[1]) and criminal sexual act in the third degree (Penal Law § 130.40[1]) (T1524-25).

37.    On May 13, 2016, the petitioner filed a motion to set aside the verdict in the Supreme Court. The motion was opposed by the prosecution. On May 25, 2016, the court (Delligatti, J.) denied the motion.

38.    On July 8, 2016, the court sentenced the petitioner to concurrent, determinate terms of three years' imprisonment, to be followed by five years of post-release supervision (S27-28).

39.    For his behavior during the trial, the petitioner was charged with burglary in the third degree (N.Y. Penal Law § 140.20) and thirteen counts of attempted tampering with a juror in the first degree (N.Y. Penal Law §§ 110.00/215.25), under Nassau County Indictment 1859N-2016.

40.    On July 11, 2017, pursuant to a negotiated plea agreement, the Supreme Court (Harrington, J.) permitted the petitioner to plead guilty to the burglary count and two attempted tampering counts in full satisfaction of the charges against him. On August 9, 2017, in exchange for the petitioner's guilty plea and his waiver of the right to appeal, the Supreme Court sentenced the petitioner to an indeterminate term of imprisonment of one to three years on the burglary count, and to lesser concurrent terms on the attempted tampering counts.

41.    On direct appeal from the judgment of conviction in his rape case, the petitioner's retained appellate counsel raised the following claims: (1) the evidence of the petitioner's guilt was legally insufficient, and the jury's guilty verdicts were against the weight of the evidence; (2)

N.Y. Penal Law § 130.05(3)(h) was unconstitutionally vague; (3) the prosecution committed a *Brady* violation by withholding the names of the senders of certain text messages on the victim's phone; (4) the trial court erred in discharging a deliberating juror and replacing her with an alternate juror; (5) the trial court's deadlocked jury charge was erroneous; (6) the trial court erred in limiting the petitioner's cross-examination of the victim about her sexual history; (7) the voir dire of prospective jurors was conducted improperly; and (8) the prosecutor committed misconduct.

42.    In a decision and order dated October 16, 2019, the Appellate Division rejected the petitioner's claims on appeal. A four-judge panel of the court unanimously affirmed the petitioner's judgment of conviction. *People v. Hubsher*, 176 A.D.3d 972 (2d Dept. 2019).

43.    Regarding the petitioner's claim that the statute under which he was prosecuted was unconstitutionally vague, the Appellate Division held that the claim was "unpreserved for appellate review." *Id.* at 972 (citing N.Y. Crim. Proc. Law § 470.05[2]). The court went on to state that "[i]n any event, . . . Penal Law § 130.05(3)(h) is not unconstitutionally vague, as 'the statute provides the defendant with adequate notice and the police with clear criteria' for enforcement." *Hubsher*, 176 A.D.3d at 972 (quoting *People v. Stuart*, 100 N.Y.2d 412, 422 [2003]).

44.    As to the petitioner's contention that his due process rights under *Brady* were violated, the Appellate Division determined that this claim was without merit:

> The text messages were disclosed to the defendant in February 2015, more than one year before the trial began in March 2016, and those text messages were used by defense counsel to cross-examine the complainant during trial. There is no indication that any delay in disclosure of the text messages prejudiced the defense such that there was "a reasonable possibility that the outcome of the trial would have differed had the evidence been produced" at an earlier time. The People's failure to disclose the text messages in unredacted form, so as to show the identities of the individuals with whom the complainant was corresponding, did not violate *Brady*.

xiii

> The defendant failed to demonstrate that the identities of those individuals were exculpatory or impeaching, and that their testimony would have been admissible and relevant, given that the crimes with which the defendant was charged were premised upon the complainant's incapacity to consent to the sexual acts that occurred.

*Hubsher*, 176 A.D.3d at 973 (citations omitted).

45.    Regarding the trial court's failure to instruct the jury to begin deliberations anew after the substitution of a juror, the Appellate Division found that the petitioner's claim could not serve as a basis for relief, stating that "[a]lthough it would have been a better practice for the court to instruct the jury to begin deliberations anew following the substitution, there was no possibility of prejudice as a result of the court's instructions to the jury at that time." *Hubsher*, 176 A.D.3d at 975. Likewise, "[t]he Supreme Court's instructions to the jurors upon receiving a note indicating that they were unable to reach a unanimous verdict were not improper." *Id.*

46.    The petitioner sought leave from the New York State Court of Appeals to appeal from the Appellate Division's decision and order affirming his judgment of conviction. By order dated February 28, 2020, the Court (Wilson, J.) denied further review of the petitioner's claims. *People v. Hubsher*, 34 N.Y.3d 1159 (2020).

47.    According to the website of the New York State Department of Corrections and Community Supervision, the petitioner was released from prison and placed on post-release supervision on March 2, 2020.

48.    In March 2021, a year after his release from prison, the petitioner filed in the Supreme Court a motion to vacate his judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10. In his motion papers, the petitioner claimed that he was deprived of his constitutional right to the effective assistance of counsel at his trial. According to the petitioner, his trial attorney blundered by failing to retain an expert witness to testify on the petitioner's behalf that due to a

urological disorder allegedly affecting him it was impossible for the petitioner to have sexual intercourse.

49.     In opposition to the petitioner's motion, the District Attorney argued that the petitioner's complaint about his attorney did not take the trial record into account. Specifically, the petitioner omitted any mention of the recorded telephone conversations during which he had admitted to having sexual intercourse with the victim. The jury heard those recorded admissions, which proved that the victim had testified truthfully when she recounted that during her treatment session with the petitioner on April 3, 2012, he had performed oral sex on her and had penetrated her vagina with his penis and fingers. Given this conclusive evidence of a sexual relationship between the petitioner and his victim, it was no wonder that trial counsel chose not to introduce expert testimony to the effect that such a relationship was a medical impossibility. As counsel prepared for trial, it was far from unreasonable for him to have decided that any such expert testimony would be disregarded by the jurors after they had heard the petitioner himself, in his own recorded voice, admitting to having sex with the victim.

50.     By order dated July 28, 2021, the Supreme Court (Delligatti, J.) denied the petitioner's motion to vacate judgment. The court found that the petitioner's claim of ineffective assistance of counsel was without merit. The petitioner sought leave to appeal to the Appellate Division from the denial of his motion to vacate judgment. By decision and order dated October 27, 2021, the Appellate Division (Christopher, J.) denied the petitioner's application.

51.     On December 17, 2021, the petitioner filed a second motion to vacate judgment in the Supreme Court. In this second collateral challenge to his judgment of conviction, the petitioner again argued—just as he had argued in his first motion to vacate judgment—that he was deprived of his constitutional right to the effective assistance of counsel by his trial attorney's deficient

performance. However, in the petitioner's second attempt to vacate his judgment, he changed the alleged deficiency in counsel's representation forming the basis for the motion. Whereas in the first motion, the petitioner had faulted his trial attorney for failing to retain an expert to testify about the petitioner's alleged sexual impotence, in the second motion he attacked defense counsel for preventing the petitioner himself from testifying about his supposed inability to have sex. In addition, the petitioner repeated his claim from the first motion that trial counsel should have retained an expert to testify on this issue. Thus, as to the petitioner's claim that his former attorney should have mounted an "impotence" defense, the petitioner's first and second motions to vacate judgment were virtually identical, aside from the second motion's new allegation, uncorroborated by any evidence other than the petitioner's own self-serving affidavit, that his trial attorney had prevented him from testifying in his own defense.

52.    The petitioner's second claim in his second motion to vacate judgment was that the prosecution did not fulfill its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), when it handed over to the defense text messages to the victim from her acquaintances that were redacted to conceal the identities of the senders. According to the petitioner, the trial court had erred in refusing to order the prosecution to produce unredacted versions of the text messages. The petitioner had previously raised this second claim in his brief on direct appeal to the Appellate Division.

53.    In opposition to the petitioner's second motion to vacate judgment, the District Attorney argued that the petitioner's claims were procedurally barred from review and without merit. The Supreme Court (Hoefenkrieg, J.) agreed with the District Attorney, denying the petitioner's second motion to vacate judgment by order dated June 3, 2022.

54.      The petitioner next sought leave to appeal to the Appellate Division from the denial of his second motion to vacate judgment. The petitioner's application for leave to appeal was denied by the court in a decision and order dated August 5, 2022 (Christopher, J.).

55.      On June 29, 2022, over two years after his release from prison, and just one day before the term of his post-release supervision was set to expire, the petitioner filed the instant petition for a writ of habeas corpus in this Court, in which he claimed that: (1) the prosecution violated his due process rights under *Brady* when it handed over to the defense text messages to the victim from her acquaintances that were redacted to conceal the identities of the senders; (2) the petitioner's right to the effective assistance of counsel was violated by his trial attorney's mistakes, the most significant of which was the failure to call a urologist to testify about the petitioner's alleged impotence; and (3) the N.Y. Penal Law section under which the petitioner was prosecuted is unconstitutionally vague.[4]

56.      On the day after filing the federal habeas petition, June 30, 2022, the term of the petitioner's post-release supervision expired, according to the website of the New York State Department of Corrections and Community Supervision.

57.      The claims that the petitioner now raises before this Court are unavailing. One of the claims is procedurally barred from review by this Court. All are without merit. The adjudication of those claims by New York courts did not result in any decision that was contrary to, or involved an unreasonable application of, any Supreme Court precedent. Accordingly, there is no basis for this Court to grant any relief.

---

[4] The petitioner advances these three claims in his memorandum of law. In addition, in the petition itself, he appears to argue that: (1) the trial court committed reversible error by failing to instruct the reconstituted jury that it must start deliberations anew; and (2) the trial court committed reversible error by failing to deliver a proper *Allen* charge. In his memorandum of law, however, these two claims are subsumed into his claim of ineffective assistance of counsel.

58.     In accordance with the Court's order, the respondent is providing the Court with copies of the following documents: (a) the respondent's affidavit and memorandum of law; (b) the transcripts of the trial and sentencing proceedings; (c) the petitioner's and the District Attorney's Appellate Division briefs on direct appeal; (d) the decision and order of the Appellate Division affirming the petitioner's judgment of conviction; (f) the petitioner's application for leave to appeal to the N.Y. Court of Appeals and the papers filed in opposition; (g) the order of the N.Y. Court of Appeals denying the petitioner leave to appeal; (h) the petitioner's two motions to vacate judgment and the papers filed in opposition; (i) the Supreme Court's orders denying the motions to vacate judgment; (j) the petitioner's leave applications to the Appellate Division seeking further review of the motions to vacate judgment and the papers filed in opposition; and (k) the Appellate Division's orders denying leave to appeal from the denial of the petitioner's motions to vacate judgment.

WHEREFORE, and for the reasons set forth in the accompanying memorandum of law, the petitioner's application for a writ of habeas corpus should be denied.

/s/ Jason R. Richards
Jason R. Richards
Assistant District Attorney

Sworn to before me this
27th day of April, 2023.


/s/ Susan Beallias
SUSAN BEALLIAS
Notary Public, State of New York
No. 30-4728937
Qualified in Nassau County
Commission Expires April 30, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

MARSHALL HUBSHER,                                    22-CV-03821 (JMA)

             *Petitioner,*

      *- against -*

DEPARTMENT OF CORRECTIONS
COMMUNITY SUPERVISION
PROBATION OFFICER DWAYNE SHAW,

             *Respondent.*

_____


RESPONDENT'S MEMORANDUM OF LAW


                                        Respectfully submitted,

                                        Anne T. Donnelly
                                        District Attorney, Nassau County
                                        *Attorney for Respondent*
                                        262 Old Country Road
                                        Mineola, New York 11501
                                        (516) 571-3660


                           By:          JASON R. RICHARDS
                                        Assistant District Attorney



Tammy J. Smiley
Jason R. Richards
  Assistant District Attorneys
    *of Counsel*

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Smith*,
 2011 WL 476607 (S.D.N.Y. Feb. 9, 2011) ............................................................................ 16

*Brady v. Maryland*,
 373 U.S. 83 (1963) .................................................................................................... passim

*Carmona v. U.S. Bureau of Prisons*,
 243 F.3d 629 (2d Cir. 2001) ............................................................................................ 18, 19

*Coleman v. Thompson*,
 501 U.S. 722 (1991) ........................................................................................................... 19

*Comstock v. Humphries*,
 786 F.3d 701 (9th Cir. 2015) ............................................................................................. 3, 4

*Downs v. Lape*,
 657 F.3d 97 (2d Cir. 2011) ............................................................................................. 17, 18

*Farrell v. Burke*,
 449 F.3d 470 (2d Cir. 2006) .............................................................................................. 21

*Garvey v. Duncan*,
 485 F.3d 709 (2d Cir. 2007) .............................................................................................. 18

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972) ........................................................................................................... 21

*Harrington v. Richter*,
 562 U.S. 86 (2011) .................................................................................................... 4, 13, 20

*Harris v. Reed*,
 489 U.S. 255 (1989) ........................................................................................................... 18

*Hill v. Colorado*,
 530 U.S. 703 (2000) ........................................................................................................... 20

*Kolender v. Lawson*,
 461 U.S. 352 (1983) ........................................................................................................... 20

*Kyles v. Whitly*,
 514 U.S. 419 (1995) ............................................................................................................. 8

*Lee v. Kemna*,
　534 U.S. 362 (2002) ............................................................................................ 18

*Lockyer v. Andrade*,
　538 U.S. 63 (2003) ............................................................................................. 20

*McCray v. Capra*,
　45 F.4th 634 (2d Cir. 2022) ........................................................................ 8, 9, 10

*Medina v. Gonyea*,
　111 F.Supp.3d 225 (E.D.N.Y. 2015) ............................................................ 15, 19

*Mercado v. Rockefeller*,
　502 F.2d 666 (2d Cir. 1974) .............................................................................. 16

*People v. Delorbe*,
　35 N.Y.3d 112 (2020) .................................................................................. 17, 18

*People v. Hubsher*,
　176 A.D.3d 972 (2d Dept. 2019) .................................................................. passim

*People v. James*,
　98 A.D.2d 863 (3d Dept. 1983) ........................................................................... 7

*People v. Lopez*,
　71 N.Y.2d 662 (1988) ........................................................................................ 18

*People v. Mathis*,
　8 A.D.3d 966 (4th Dept. 2004) ........................................................................... 14

*People v. Mormile*,
　28 A.D.3d 333 (1st Dept. 2009) ........................................................................... 7

*People v. Nelson*,
　69 N.Y.2d 302 (1987) ........................................................................................ 20

*People v. Scott*,
　67 A.D.3d 1052 (3d Dept. 2009) .......................................................................... 7

*People v. Stuart*,
　100 N.Y.2d 412 (2003) .................................................................................. 13, 17

*Premo v. Moore*,
　562 U.S. 115 (2011) ........................................................................................... 13

ii

*Rattray v. Brown*,
    261 F. Supp. 2d 149 (E.D.N.Y. 2003) .................................................................................. 18

*Schlup v. Delo*,
    513 U.S. 298 (1995) ............................................................................................................. 19

*Smith v. Cain*,
    565 U.S. 73 (2012) ............................................................................................................. 8, 9

*Strickland v. Washington*,
    466 U.S. 668 (1984) ............................................................................................................. 13

*Strickler v. Greene*,
    527 U.S. 263 (1999) ............................................................................................................... 4

*Thibodeau v. Portuondo*,
    486 F.3d 61 (2d Cir. 2007) .................................................................................................. 17

*United States v. Bagley*,
    473 U.S. 667 (1985) ............................................................................................................... 8

*United States v. Benchick*,
    __ F. Supp.,2022 WL 3130230 (E.D. Mich. Aug. 4, 2022) ................................................. 6

*United States v. Mohamed*,
    148 F. Supp. 3d 232 (E.D.N.Y. 2015) .................................................................................. 5

*United States v. Nadi*,
    996 F.2d 548 (2d Cir. 1993) ................................................................................................. 21

*United States v. Prior*,
    546 F.2d 1254 (5th Cir. 1977) ............................................................................................... 5

*United States v. Purin*,
    486 F.2d 1363 (2d Cir. 1973) ................................................................................................ 5

*Velasquez v. Leonardo*,
    898 F.2d 7 (2d Cir. 1990) .................................................................................................... 18

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................................................. 21

*White v. Woodall*,
    572 U.S. 415 (2014) ......................................................................................................... 4, 20

iii

*Williams v. Taylor*,
   529 U.S. 362 (2000) ................................................................................................ 20

*Williams v. Taylor*,
   529 U.S. 420 (2000) ................................................................................................ 19

*Williams v. United States*,
   503 F.2d 995 (2d Cir. 1974) ...................................................................................... 5

## Statutes

28 U.S.C. § 2254 ............................................................................................ 15, 17, 20

N.Y. Crim. Proc. Law § 440.10 ........................................................................... 1, 15

N.Y. Crim. Proc. Law § 470.05 ......................................................... 13, 16, 17, 18, 19

N.Y. Penal Law § 130.05 ................................................................................. passim

N.Y. Penal Law § 130.25 ........................................................................................ 1

N.Y. Penal Law § 130.30 ........................................................................................ 7

N.Y. Penal Law § 130.40 ........................................................................................ 1

U.S. Const., Amend. VI ......................................................................................... 13

iv

<u>INTRODUCTION</u>

On April 3, 2012, the petitioner, a psychiatrist, had sex with his patient during her treatment session with him. The patient reported the incident to the police several days later. At their request, she participated in recorded telephone calls with the petitioner and turned over voicemails from him. In the voicemails and recorded calls, in addition to discussing the patient's treatment, the petitioner admitted that he had had sex with her during her last treatment session.

Prosecuting the petitioner under the theory that his patient could not consent to the petitioner's conduct because she was his patient and the conduct occurred during a treatment session (N.Y. Penal Law § 130.05[3][h]), the People charged the petitioner with rape in the third degree (N.Y. Penal Law § 130.25[1]) and criminal sexual act in the third degree (N.Y. Penal Law § 130.40[1]). Following a jury trial, the petitioner was convicted of both charges and was sentenced to three years in prison.

On appeal to the Appellate Division, the petitioner claimed, among other things, that N.Y. Penal Law § 130.05(3)(h) was unconstitutionally vague, and that his due process rights under *Brady* were violated by the prosecution's failure to provide him with unredacted text messages from the victim's phone. A unanimous panel of the Appellate Division disagreed with the petitioner. His application for further review of his claims by the New York State Court of Appeals was denied by that court.

Next, in collateral challenges to his judgment of conviction under N.Y. Crim. Proc. Law § 440.10, the petitioner argued, among other things, that his trial attorney was ineffective for failing to retain a urologist to testify that the petitioner was impotent, and—once again—that the prosecution committed a *Brady* violation by not providing him with the unredacted text messages

1

from the victim's phone. Both the petitioner's motions to vacate his judgment of conviction were denied.

Now, in his application for federal habeas corpus relief, the petitioner reprises the aforementioned claims, one of which is barred from this Court's review. None merits relief. For the foregoing reasons and those set forth in the "Argument" section below (pp. 3-21, *infra*), the petition should be denied.

A R G U M E N T

POINT I

The Petitioner's *Brady* Claim Entitles Him To No Relief Because He Has Failed To Demonstrate That The State Courts' Adjudication Of The Claim Was Objectively Unreasonable (Responding To Point 1 Of The Memorandum Of Law In Support Of The Petition).

Over one year before the petitioner's trial commenced, the prosecutor disclosed two text message conversations taken from the victim's phone. Each conversation was between the victim and a different third party. The names of her interlocutors were redacted because the third parties were not involved in the case and, hence, their names had no relevance. In response, the petitioner twice moved, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), for an order compelling the People to provide copies of the messages with the names unredacted. The trial court, after reviewing the unredacted messages *in camera*, denied both applications, finding that the names had no exculpatory or impeaching value and that the redactions did not prejudice the petitioner.[1] The Appellate Division upheld the trial court's decision, stating that the petitioner had "failed to demonstrate that the identities of those individuals were exculpatory or impeaching, and that their testimony would have been admissible and relevant, given that the crimes with which the defendant was charged were premised upon the complainant's incapacity to consent to the sexual acts that occurred." *Hubsher*, 176 A.D.3d at 973 (citations omitted).

Now, petitioner again argues that the redactions constituted a *Brady* violation. In this habeas proceeding, it is the petitioner's burden to show that the Appellate Division's "application of *Brady* was objectively unreasonable." *Comstock v. Humphries*, 786 F.3d 701, 707 (9th Cir.

___

[1] *See* Motion Decisions, Sept. 21, 2015, and Feb. 29, 2016.

3

2015) (citations and quotation marks omitted). This is a burden that the petitioner has not carried, and which he cannot carry—for the simple reason that there was no *Brady* violation in this case.

"Objective unreasonableness is a very demanding standard; 'even clear error will not suffice.'" *Comstock*, 786 F.3d at 707 (quoting *White v. Woodall*, 572 U.S. 415, 419 [2014]) (internal quotation marks omitted). "Rather, '[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 419-20 (quoting *Harrington v. Richter,* 562 U.S. 86, 103 [2011]). Here, there was *no error* in the state courts' application of *Brady*, much less an error so glaring that it was objectively unreasonable according to the precedents of the United States Supreme Court.

The Court has held that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). As the record of the petitioner's trial clearly shows, he has failed to demonstrate the presence of any of these components in his case.

In the first set of disputed text messages, the victim told a third party that she had "reported [the petitioner]" for raping her, and that person told her, "Reporting it is fucked up, especially if he gave you money." The victim countered, "You need to Google sex with a patient. Totally illegal and fucked up. He took advantage of me." The third party nonetheless insisted, "You did it for the money and the blackmail. That's how it looks." In the second set of text messages, which also were exchanged after Kerry had already reported the petitioner to the police, a different third party

4

told her that he had found a lawyer for her who would "advise [her] for nothing." Kerry responded, "I'm so overwhelmed right now. I can't even think that far ahead." The third party suggested that Kerry should get "a guy who will put pressure on the cops to make the criminal case strong," so that she could then "clean [the petitioner] out civilly."[2]

As noted above, the prosecutor provided both sets of these text messages in full to the petitioner over one year before his trial after redacting only the names of the respective third parties in the conversations. Hence, it cannot be said that the messages themselves constituted *Brady* material because the prosecutor did not suppress them. *See United States v. Prior,* 546 F.2d 1254, 1259 (5th Cir. 1977) ("[T]he government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.") (citing *Williams v. United States*, 503 F.2d 995 [2d Cir. 1974]; *United States v. Purin*, 486 F.2d 1363 [2d Cir. 1973]; *et al.*). Indeed, at trial defense counsel thoroughly cross-examined Kerry regarding the text messages (T684-710). *See United States v. Mohamed*, 148 F. Supp. 3d 232, 245-46 (E.D.N.Y. 2015) (noting that *Brady* material is properly disclosed when it is made available to defendant "in time for its effective use at trial").

To the extent that the petitioner argues that the prosecution was required to disclose the redacted third-party names so that he could "try to call the redacted texting parties as witness[es] to offer proof supporting Mr. Hubsher's defense" (Petitioner's Memo. of Law at 9), his claim also fails. The petitioner's knowledge of who the third parties were would have added nothing to his defense—indeed, that knowledge had no effect on the course of the trial when the petitioner learned the identities of the third parties during Kerry's cross-examination. As a witness for the defense, each third party could have offered only impermissible hearsay—summaries of text

---

[2] Both sets of text messages are reproduced at pages 9-13 of the People's opposition to the petitioner's motion to set aside the verdict.

messages or the conversations on which the messages were based—and, therefore, neither would have been permitted to testify. *See, e.g., United States v. Benchick*, __ F. Supp. 3d ___, 2022 WL 3130230, at *5 (E.D. Mich. Aug. 4, 2022) (holding that defense counsel was not ineffective for failing to move text messages into evidence because "[t]he text messages were hearsay, and therefore barred from consideration").

Significantly, as noted above, the trial court permitted defense counsel to ask Kerry who the third parties were, despite the court's earlier rulings (T691-92, 706). Even after learning their identities, counsel subpoenaed only one of these third-party "witnesses" to testify (T1076), and counsel made no further applications when the subpoena went unheeded. Thus, the petitioner's current insistence that the redaction of the names prejudiced him by suppressing exculpatory or impeaching evidence is contradicted by his own ambivalent behavior with respect to the supposedly crucial third-party "witnesses" at trial. The petitioner made, at best, a half-hearted attempt to secure the testimony of the third parties at his trial, even after their identities were known to him.

Underlying this ambivalence was, undoubtedly, the petitioner's recognition that testimony by the third-party "witnesses" would have had no exculpatory or impeachment value, or even any relevance. A third party's opinion that Kerry's reporting of the petitioner's criminal conduct to the police was "fucked up" because it might *look* like Kerry was blackmailing the petitioner was just that: the (uninformed) opinion of a third party with little or no knowledge of the circumstances of the case—*not* admissible evidence that negated the petitioner's guilt or impeached Kerry's credibility. Similarly, the other uninvolved third party's opinion that Kerry should sue the petitioner was entirely irrelevant to the question of his guilt or innocence. Nor does that third

6

party's efforts in the text messages to encourage Kerry to sue her former psychiatrist have any bearing on the victim's credibility.

Indeed, as the Appellate Division recognized, the significance of any third party's opinion that Kerry had any mercenary motives for having sex with the petitioner or pursuing his prosecution—even if, hypothetically, there were some factual basis for that opinion—was negligible because her motives, and, indeed, even her consent, had no bearing on the petitioner's criminal liability. Under New York law, having sex with someone who is incapable of consent, like the victim in this case by virtue of her status as the petitioner's patient, is a crime of "strict liability." *See People v. Mormile*, 28 A.D.3d 333 (1st Dept. 2009). In the prosecution of such crimes, many otherwise potentially relevant facts about the victim's behavior, such as whether she might have had a motive or willingness to engage in sex with the defendant or allegedly did something to "entice" him, have no relevance whatsoever. *See People v. Scott*, 67 A.D.3d 1052, 1054 (3d Dept. 2009) ("Inasmuch as Victim A's consent was not an issue with respect to the rape charge of which defendant was convicted (*see* Penal Law § 130.30[1] [sexual intercourse with another person less than fifteen years old]), the connection between her promiscuity and the credibility of her claim that sexual intercourse occurred is so tenuous and illogical that such evidence would have been irrelevant."); *People v. James*, 98 A.D.2d 863, 864 (3d Dept. 1983) ("[W]here consent is not in issue, evidence of the victim's prior sexual relations is irrelevant and, thus, properly ruled inadmissible.").

For the foregoing reasons, the Appellate Division, in rejecting the petitioner's *Brady* claim, emphasized that "the crimes with which the defendant was charged were premised upon the complainant's incapacity to consent to the sexual acts that occurred." *Hubsher*, 176 A.D.3d at 973. In other words, given that the victim's consent was not at issue, the opinion of any third party not

7

involved in the doctor-patient relationship between Kerry and the petitioner that she might have had sex to "blackmail" the doctor, or in order to sue him after the fact, had no relevance to the charges against the petitioner. All of this is to say that even if the petitioner were to demonstrate that the redacted names could have led to some admissible evidence that was exculpatory or impeaching—something that he has not come close to doing—the evidence would have been immaterial insofar as it concerned the victim's motives for having sex with the petitioner or reporting him to the police.

"Only evidence that is *material* raises due process concerns." *McCray v. Capra*, 45 F.4th 634, 641 (2d Cir. 2022) (emphasis in original). Accordingly, "the prosecutor is not obligated to 'deliver his entire file to defense counsel.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 675 [1985]). When viewed in retrospect, the prosecutor's obligation to disclose under *Brady* extends only to matters where "there is a 'reasonable probability' that the result of the trial would have been different had the relevant evidence been disclosed to the defendant." *McCray*, 45 F.4th at 641 (quoting *Kyles v. Whitly*, 514 U.S. 419, 434 [1995]). In this context, "[a] reasonable probability is 'the likelihood of a different result [that] is great enough to undermine confidence in the outcome of the trial.'" *McCray*, 45 F.4th at 641 (quoting *Smith v. Cain*, 565 U.S. 73, 75 [2012]).

Here, the victim's credible testimony about her rape by the petitioner was corroborated by his own recorded admissions that he had committed the rape, as well as by other compelling evidence. In such a case, there is no reasonable probability that the testimony of one or both of the victim's acquaintances with whom she had exchanged text messages would have led to the petitioner's acquittal. That this is so becomes impossible to deny when one considers that at trial defense counsel thoroughly cross-examined the victim about the acquaintances' opinions and their identities. Moreover, had the petitioner actually called the acquaintances as witnesses at his trial,

8

their cross-examinations by the prosecutor only would have highlighted their ignorance of the facts of the case and convinced the jury that the unfounded opinions they had expressed in the text messages were entirely worthless as indicia of the petitioner's guilt.

Except inasmuch as the instant case included the petitioner's own admissions of guilt, it is not dissimilar to *McCray v. Capra*, where "[t]he underlying criminal case was ultimately a credibility contest." 45 F.4th at 637. According to the victim in that case, "she was violently raped by McCray. According to McCray, he and the victim had consensual sex[.]" *Id.* at 638. When the defendant learned prior to his trial that the victim had a history of mental illness, he requested all 5,000 pages of her mental health records from the prosecution. *Id.* After an *in camera* review of these voluminous records, the trial court provided the defendant with a mere "twenty-eight-page sample" of the records "that it deemed representative." *Id.* The matter proceeded to trial, where "the prosecution elicited testimony from the victim regarding her mental health, and the defense vigorously cross-examined her on that subject. The jury returned a guilty verdict." *Id.* Then, "[o]n direct appeal in the New York state courts, McCray challenged the decision to provide him with only a sample of the victim's mental health records, arguing that doing so violated his right to due process under *Brady*." *Id.* The state courts affirmed his judgment of conviction. McCray next petitioned for federal habeas corpus relief, which the district court denied. *Id.*

In affirming the district court's denial of the petition, the Second Circuit noted that "there is nothing in the Supreme Court's caselaw to suggest that providing only a sample of the victim's mental health records was improper." *Id.* at 642. Indeed, "not every document that could be used to impeach a witness is so devastating that depriving a defendant of it 'undermine[s] confidence in the outcome of the trial.'" *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 75 [2012]). In *McCray*, the defendant "was given a wealth of information in pretrial disclosures; the victim testified about her

9

various mental health issues in open court; and the victim was cross-examined vigorously on her mental illness, her erratic behavior, and—by extension—her reliability." *McCray*, 45 F.4th at 645. Accordingly, "[b]ased on the entire record," the Second Circuit could not "say that no fair-minded jurists would agree with the New York Court of Appeals that McCray received a fair trial." *Id.*

In this case, too, the prosecution provided the petitioner with "a wealth of information," including all the text messages at issue. Unlike in *McCray*, where the prosecution chose not to disclose the overwhelming majority (several thousand pages) of relevant records, the only missing items from the pretrial disclosures in this case were the names of the interlocutors in the text message conversations. Even those names were subsequently revealed at trial, in time for the petitioner to have called these third parties as witnesses during his case. That the petitioner failed to call either party as a witness is significant because it suggests that even he did not believe they had anything important to add to his defense. Moreover, the victim in this case, like the victim in *McCray* with respect to her mental illness, was vigorously cross-examined on the text messages and the senders of those messages. Under such circumstances, it was far from unreasonable for the Appellate Division to conclude that the petitioner received a fair trial, and he has utterly failed to show otherwise.

In this and all prior proceedings in this case, the petitioner has failed to show that the redacted names in the disclosed text messages could have led to exculpatory or impeaching evidence that would have been favorable to him at his trial. In addition, the petitioner has failed to show that the prosecution suppressed the names, which were revealed to him before he presented his case at trial. Finally, the petitioner has not established that any actual prejudice resulted to him as a result of the redactions. In short, the petitioner has not shown that there was ever a genuine *Brady* violation in this case. Nor has he demonstrated in this proceeding that the state courts'

10

conclusion that no such violation occurred was objectively unreasonable. Accordingly, the petitioner is entitled to no relief from this Court.

POINT II

The Petitioner Has Failed To Demonstrate That The State Courts Applied *Strickland* Unreasonably In This Case, Where The Record Establishes That Trial Counsel Was A Competent Professional Who Had A Viable Defense Strategy (Responding To Point II Of The Memorandum Of Law In Support Of The Petition).

The petitioner alleges two errors by his trial attorney that supposedly violated the petitioner's Sixth Amendment right to effective assistance of counsel. First, he complains that defense counsel neglected to call a urologist as a witness to testify on the petitioner's behalf that he suffered from a genital disorder which made it impossible for him to have sex. Second, trial counsel was ineffective, according to the petitioner, because he failed to object: (a) when the trial court neglected to instruct the jury to begin deliberations anew after substituting a juror; and (b) when the court delivered an improper *Allen* charge to the jury in response to its communication that deliberations were at an impasse (Petitioner's Memo. of Law at 13-17).[3] The petitioner raised the foregoing claims previously in his first post-conviction motion to vacate judgment in the Supreme Court. In response, the court held that the petitioner's first claim, regarding the urologist, was without merit because the introduction of evidence of the petitioner's impotence would have been "at odds with" counsel's reasonable strategy of contesting whether the sexual encounter took place during a "treatment session" (Decision, July 28, 2021, at 3). As to the second set of alleged errors by counsel—regarding his failure to object on two occasions—the court determined that these supposed errors were procedurally barred from review and, in any event, did not constitute ineffective assistance of counsel. Because the state court's determination that petitioner received the effective assistance of counsel, notwithstanding the errors alleged by him, was neither contrary

---

[3] In the petition itself, the petitioner suggested that in this proceeding he would be challenging the trial court's instructions—separately from his ineffective assistance of counsel claim— in a free-standing claim that the court had violated his constitutional rights. In the petitioner's memorandum of law, however, he subsumed the trial court's instructions into his ineffective assistance of counsel claim.

12

to, nor an unreasonable application of Supreme Court precedent, this Court, too, should reject petitioner's complaints about his trial attorney.

The right to effective assistance of counsel in criminal proceedings is guaranteed by the United States Constitution. *See* U.S. CONST., Amend. VI. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court adopted a two-pronged test for evaluating claims that trial counsel was ineffective. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Scrutiny of counsel's performance under this test is "highly deferential." *Id.* at 689. Indeed, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* When a claim of ineffective assistance of counsel arises in the context of a federal habeas corpus petition, the standard of review is "doubly" deferential: "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal citations omitted); *accord Premo v. Moore*, 562 U.S. 115, 122-23 (2011).

Here, the petitioner has not met this demanding standard. He not only has failed to establish that trial counsel was ineffective, but he has also failed to establish that the state court's decision regarding counsel's performance was contrary to, or involved an unreasonable application of, *Strickland* and its progeny.

In its decision of July 28, 2021, the Supreme Court noted that trial "counsel elected to defend the case on the theory that the victim consented to the sexual encounters; that they did not take place during therapy sessions; and that the defendant was not the victim's therapist"

13

(Decision, July 28, 2021, at 3). The court noted also that the petitioner had failed to "establish that counsel's strategy was unreasonable" (*id.*). Moreover, counsel's introduction of evidence of the petitioner's sexual impotence "would have been at odds with that reasonable strategy" (*id.*).

Such evidence would have been at odds, too, with uncontestable proof of the sexual conduct presented during the prosecution's case, when the jury heard the petitioner himself, in recorded voicemails and telephone calls (People's Trial Exhibits 3, 4, 5, 7), admit that he had had sex with Kerry during their second appointment. In one of those recordings (People's Trial Exhibit 3), the petitioner assured Kerry that she was the only patient he had ever "slept with," discussed with Kerry the "intercourse" they had in his office, expressed doubt to Kerry that he had hurt her when he had performed oral sex on her, and asked Kerry whether he was too rough when "using [his] finger too" (Exhibit 2 at 10, 29). This evidence corroborated the victim's credible testimony that the petitioner had licked her vagina and penetrated her with his penis and fingers in his office on April 3, 2012, during a treatment session. Given these considerations, the petitioner's trial counsel may well have concluded, very reasonably, that calling the urologist as an expert witness could backfire, damaging his client's case, and that even if the doctor's testimony did not hurt the petitioner, it stood very little chance of actually helping him. *See People v. Mathis*, 8 A.D.3d 966, 967 (4th Dept. 2004) ("We agree with defendant that defense counsel's examination of defendant's expert urologist did not aid and may have harmed the defense.").

As to defense counsel's alleged failure "to challenge certain legal rulings or instructions," the Supreme Court noted that these claims were "all based upon facts that are apparent from the trial record" (Decision, July 28, 2021, at 3). The "claims should have been raised by the defendant on his direct appeal and his failure to do so precludes this Court from vacating the judgment of

14

conviction on these grounds" (*id.*) (citing N.Y. Crim. Proc. Law § 440.10[2][c]).[4] The court went on to state that the claims were meritless "in any event" as "most of the instructions or legal rulings that the defendant now claims should have been objected to were found by the Appellate Division to be either proper or non-prejudicial" (Decision, July 28, 2021, at 3-4).[5]

Nothing in the Supreme Court's well-reasoned decision can be plausibly interpreted as contrary to, or involving an unreasonable application of, the Supreme Court's standard set forth in *Strickland*. The totality of the circumstances demonstrates that defense counsel's assistance was effective, and the petitioner has failed to satisfy his burden of establishing that counsel's strategic choices were objectively unreasonable, and that the petitioner was prejudiced by his lawyer's alleged shortcomings. The petitioner's convictions were not the result of his counsel's representation, but of the overwhelming proof of the petitioner's guilt. Accordingly, there is no legitimate basis for habeas corpus relief.

---

[4] This provision of the New York Criminal Procedure Law has been held to constitute an independent and adequate state ground for denying relief sought on the basis of record-based ineffective assistance of trial counsel claims. *See, e.g., Medina v. Gonyea*, 111 F.Supp.3d 225, 236-37 (E.D.N.Y. 2015). Here, the petitioner has failed to make an exceptional showing of cause and prejudice for his default. Indeed, he makes no attempt to show any cause for his default or any resulting prejudice from the default. Accordingly, in this case the petitioner's claims regarding his trial attorney's failures to object are barred from this Court's review.

[5] Indeed, regarding the trial court's failure to instruct the jury to begin deliberations anew after the substitution of a juror, the Appellate Division found that the petitioner's claim could not serve as a basis for relief, stating that "[a]lthough it would have been a better practice for the court to instruct the jury to begin deliberations anew following the substitution, there was no possibility of prejudice as a result of the court's instructions to the jury at that time." *Hubsher*, 176 A.D.3d at 975. Likewise, "[t]he Supreme Court's instructions to the jurors upon receiving a note indicating that they were unable to reach a unanimous verdict were not improper." *Id.* The Appellate Division's adjudication of these claims did not result in a decision that was contrary to, or involved an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

POINT III

The Petitioner's Challenge To The Constitutionality Of Section 130.05(3)(h) Of The New York Penal Law Is Barred From This Court's Review And, In Any Event, Entirely Without Merit (Responding To Point III Of The Memorandum Of Law In Support Of The Petition).

The Appellate Division correctly held that the petitioner's challenge to the constitutionality of N.Y. Penal Law § 130.05(3)(h) was unpreserved for appellate review pursuant to N.Y. Crim. Proc. Law § 470.05(2). *Hubsher*, 176 A.D.3d at 972. The record shows that the petitioner did not assert this challenge at his trial, as he was required to do in order to preserve the argument for appellate review. Thus, New York's contemporaneous objection rule constituted an independent and adequate state procedural ground for the state court's rejection of the petitioner's claim. *See Acevedo v. Smith*, No. 08 Civ. 9899(SAS), 2011 WL 476607 (S.D.N.Y. Feb. 9, 2011) at *7 (concluding that petitioner's unpreserved argument that depraved indifference murder statute was unconstitutionally vague was precluded from federal review by independent and adequate state law doctrine). *But see Mercado v. Rockefeller*, 502 F.2d 666, 672 (2d Cir. 1974) (concluding that the claim a statute was "unconstitutionally vague could be presented on appeal to the New York appellate courts even if not first presented and preserved at the trial level"). Moreover, the petitioner has failed to show that any exceptional circumstance would warrant federal habeas review of his claim that the statute is unconstitutionally vague, notwithstanding the independent and adequate state ground for the Appellate Division's rejection of the claim.

But even if the claim were not barred from review, the petitioner would be entitled to no relief because the claim is entirely without merit. In rendering an alternative holding by deciding that "[i]n any event, . . . Penal Law § 130.05(3)(h) is not unconstitutionally vague" (*Hubsher*, 176 A.D.3d at 972), the Appellate Division did not issue "a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme

16

Court of the United States." 28 U.S.C. § 2254(d); *see also Thibodeau v. Portuondo*, 486 F.3d 61, 69 (2d Cir. 2007) ("[W]e hold that the [first-degree kidnapping] law is not unconstitutionally vague and that the decision of the New York courts on this claim was therefore not contrary to, nor an unreasonable application of, clearly established federal law."). The statute is not vague. As the Appellate Division correctly stated, the statute provided adequate notice to the petitioner and clear criteria for enforcement to the police. *Hubsher*, 176 A.D.3d at 972.

A.    The Petitioner Has Failed To Make The Exceptional Showing Of Cause And Prejudice That Would Allow Habeas Review Of His Procedurally Defaulted Claim.

Before and during his trial, the petitioner failed to argue, as he argues now, that Penal Law § 130.05(3)(h) was unconstitutionally vague. Therefore, when the petitioner raised this argument for the first time on direct appeal, the Appellate Division correctly ruled that it was unpreserved for appellate review. *Hubsher*, 176 A.D.3d at 972 (citing N.Y. Crim. Proc. Law § 470.05[2]). The court went on to hold that the argument was meritless "[i]n any event," explaining that "contrary to the defendant's contention, Penal Law § 130.05(3)(h) is not unconstitutionally vague, as 'the statute provides the defendant with adequate notice and the police with clear criteria' for enforcement." *Hubsher*, 176 A.D.3d at 972 (quoting *People v. Stuart*, 100 N.Y.2d 412, 422 [2003]).

Under New York law, before an appellate court may review a claim as a matter of law, that claim must first be raised at the appropriate time at the trial level. This is known in federal courts as the "contemporaneous objection rule." *Downs v. Lape*, 657 F.3d 97, 102 (2d Cir. 2011). The rule, codified at section 470.05 of the New York Criminal Procedure Law, "is a firmly established and regularly followed New York procedural rule." *Downs*, 657 F.3d at 104. "This requirement allows the trial court 'an opportunity to correct any error in the proceedings below at a time when the issue can be dealt with most effectively.'" *People v. Delorbe*, 35 N.Y.3d 112, 119 (2020)

17

(quoting *People v. Lopez,* 71 N.Y.2d 662, 665 [1988]). In addition, the contemporaneous objection rule "preserves limited judicial resources and avoids untoward delay in the resolution of criminal proceedings." *Delorbe*, 35 N.Y.3d at 119 (internal citations omitted). "Lastly, it protects 'the very real interest of the State in achieving finality in a criminal prosecution.'" *Id.* (quoting *Lopez,* 71 N.Y.2d at 665).

The contemporaneous objection rule, relied upon by the state appellate court in this case, "constitutes an independent and adequate state law ground for disposing of a claim" raised in a federal habeas corpus action. *Downs*, 657 F.3d at 104*; see also Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007) ("[T]he procedural bar of § 470.05(2) constitutes an independent and adequate state ground for the Appellate Division's holding."). "Federal courts generally will not consider a federal issue in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey*, 485 F.3d at 713 (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). That is so even if—as in this case—the Appellate Division evaluates the merits of an unpreserved contention in an alternative holding. "It is well settled that where a state court decision states that a claim is procedurally barred, and then rules 'in any event' on the merits, the claim is procedurally barred." *Rattray v. Brown*, 261 F. Supp. 2d 149, 156 (E.D.N.Y. 2003) (citing *Harris v. Reed,* 489 U.S. 255, 264 n.10 [1989]; *Velasquez v. Leonardo*, 898 F.2d 7, 9 [2d Cir. 1990]).

Accordingly, this Court should not review the petitioner's claim of unconstitutional vagueness. Federal review of such a defaulted claim is permissible "[o]nly upon the exceptional showing of 'cause and prejudice' for the state delinquency." *Carmona v. U.S. Bureau of Prisons*,

243 F.3d 629, 633 (2d Cir. 2001).[6] The "principles of comity, finality, and federalism" require such an exceptional showing in order "to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). This requirement "concerns the respect that federal courts owe the States and the States' procedural rules when reviewing the claims of state prisoners in federal habeas corpus." *Coleman v. Thompson,* 501 U.S. 722, 726 (1991). In keeping with these principles, the Second Circuit has "recognized the sovereignty of state tribunals, and refused to consider a state prisoner's defaulted habeas claim absent a sufficient justification for the noncompliance." *Carmona*, 243 F.3d at 633.

Here, the petitioner has failed to make an exceptional showing of cause and prejudice. Indeed, he makes no attempt to show any cause for his default or any resulting prejudice from the default. Hence, the petitioner's claim is barred from this Court's review.

> B.    It Was Not Objectively Unreasonable For The Appellate Division To Conclude That Penal Law § 130.05(3)(h) Provided Adequate Notice To The Petitioner And Clear Criteria For Enforcement To The Police.

Even if the petitioner's claim of unconstitutional vagueness were not barred from review, he would be entitled to no relief from this Court because the claim is without merit. The petitioner cannot meet his burden of establishing that the Appellate Division's adjudication of his claim resulted in a decision that was contrary to, or involved an unreasonable application of, Supreme

---

[6] There are two other circumstances, in addition to a petitioner's showing of "cause and prejudice," in which "[a] federal habeas petitioner may seek review of his federal claims notwithstanding the existence of independent and adequate state law grounds for the state courts' decision . . . . First, he may do so if he is actually innocent of the crime for which he has been convicted. Second, he may also do so if the state law, while generally adequate, has been applied exorbitantly." *Medina*, 111 F. Supp. 3d at 233 (citations omitted). Neither exception is applicable here. A petitioner may establish his "actual innocence" for the purpose of overcoming independent and adequate state law grounds by showing that in the light of new evidence "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Here, the petitioner has presented no new evidence or otherwise made any attempt to establish his "actual innocence." Nor has he alleged that C.P.L. § 470.05(2) was applied exorbitantly in this case.

19

Court precedent. 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 409-15 (2000). An "'unreasonable application of'" such precedent "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). "Rather, '[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 419-20 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 [2011]).

Under federal constitutional law, "[a] statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."). Likewise, under New York law, "[a] vagueness challenge involves a two-part analysis. First, it must be determined whether the statute in question is sufficiently definite to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. Second, a statute must provide explicit standards for those who apply them so as to avoid resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *People v. Nelson*, 69 N.Y.2d 302, 307 (1987) (internal citations and quotation marks omitted).

20

In determining that Penal Law § 130.05(3)(h) was not unconstitutionally vague, the Appellate Division did not stray from any relevant Supreme Court precedent. To the contrary, according to such precedents, the petitioner's challenge to the statute was entirely without merit. Because his "conduct was clearly proscribed by the statute," the petitioner "cannot successfully challenge it for vagueness." *United States v. Nadi*, 996 F.2d 548, 551 (2d Cir. 1993) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 n. 7 [1982]). Indeed, the petitioner's claim that the statute—which forbids a doctor from sexual contact with a patient "during a treatment session, consultation, interview, or examination" (Penal Law § 130.05[3][h])—did not provide adequate notice that it barred him from having sex with Kerry in his office at the conclusion of her therapy, before she had even stood up from the patient couch, defies credulity. In short, N.Y. Penal Law § 130.05(3)(h) is not a "[v]ague law[ ]" that "trap[s] the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Nor does the statute present any enforcement difficulties. To the contrary, Penal Law § 130.05(3)(h) "provides sufficient guidelines to eliminate generally the risk of arbitrary enforcement." *Farrell v. Burke*, 449 F.3d 470, 493 (2d Cir. 2006). Indeed, those guidelines are very specific. The statute applies only to sexual conduct by a "health care provider or mental health care provider" who engages in such conduct with "a client or patient . . . during a treatment session, consultation, interview, or examination." Penal Law § 130.05(3)(h). Such language harbors no potential for arbitrary enforcement.

In sum, this Court's review of the petitioner's vagueness argument is precluded by an independent and adequate state ground for the Appellate Division's affirmance of his judgment of conviction. But even if the claim were reviewable, the petitioner would be entitled to no relief because the statute he challenges is far from being unconstitutionally vague.

21

CONCLUSION

The Petition For A Writ of Habeas Corpus Should Be Denied.

Dated:   Mineola, New York
         April 27, 2023

                                        Respectfully submitted,

                                        Anne T. Donnelly
                                        District Attorney, Nassau County
                                        *Attorney for Respondent*
                                        262 Old Country Road
                                        Mineola, New York 11501
                                        (516) 571-3660


                          By:        /s/ Jason R. Richards
                                     JASON R. RICHARDS


Tammy J. Smiley
Jason R. Richards
  Assistant District Attorneys
    *of Counsel*

22

**Certificate of Service**

I hereby certify that, on April 27, 2023, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon:

Brent A. Chapman, Esq.
Law Office of Brent Chapman, P.C.
199 2nd Street, Suite West 339
Mineola, NY 11501-6016

Anne T. Donnelly
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3660

By:    /s/ Jason R. Richards
JASON R. RICHARDS